Good morning. I'm Randall Ensminger, the attorney for Dr. Brandner on this appeal. I was also his trial attorney in the first trial that was aborted by my illness. And I have taken – I took over the case again after the second trial and sought the motion for a new trial. In between, do I understand, it was Mr. Werksman? That is correct. Okay. And part of your argument on appeal was that he was – fell below the standard of care. Not exactly, Your Honor. That was just my introduction of myself. And so if I may continue again, may it please the Court. There's no contention in this criminal case that Dr. Brandner was given ineffective legal assistance in the criminal proceeding? No, we did not make a claim of ineffective assistance of counsel, Your Honor. Okay. We made a claim only that he was denied his right to choose counsel and violated the Sixth Amendment as a result of improper balancing. I got you. Go ahead. Sorry to interrupt you. Well, that's okay. We're going to get to that point again, or hopefully we will. I'd like to reserve five minutes of my time, if I could please, for a rebuttal. May I please? The key to this appeal is really the overall unfairness of this criminal prosecution against Dr. Brandner. He was treated unfairly from the very start when the government came upon Joseph Serenella, the disbarred attorney, through a penny stock fraud case that he got arrested in, became a government informant. And from the time they began using Dr. Brandner's own attorney against him to entrap him into saying things on the phone that were not what his true intent was. Was it an entrapment defense? Well, the problem is the entrapment began before he was. The charges here relate to the sending of that letter to the state court in Alaska. And that is something that Serenella engineered, but he engineered that not as a government agent, but he engineered that as a crook and a criminal who was working to steal Dr. Brandner's money. And we believe the evidence in this case shows that from the time... I'm sorry. I asked a question. Is the answer no? I'm sorry if I overlooked that question. What was the question? It often happens. The question I asked is, was it an entrapment defense? No, we did not assert an entrapment defense. No. All right. Okay. So why are you talking about entrapment here? Because the overall... Is it sort of playing to the jury over there? The overall unfairness of the case starts with that, and it continues to infect the proceedings all the way through the case, including the... I'm sorry. What's unfair? How is this different from every other case we have where there is a government informant involved? Who's frequently dirtied. Yeah. This is how government informants are. It's not too frequent, Your Honor, that the government uses your own lawyer against you. But he wasn't a lawyer. Yes, he was a lawyer. He was apparently a disbarred lawyer, but he was a lawyer. He represented himself to be a lawyer. He was referred to my client by another lawyer who believed him to be a lawyer. My client's testimony... I'm sorry. Are you claiming that your client thought he was a lawyer? Absolutely he did. When I say a lawyer, I mean a member of the bar? Absolutely. He never... If he'd have known he was a disbarred attorney or some kind... And you're saying this, this is in the record. This is what he testified to at the motion to dismiss. Yes, my client, Dr. Bradner, did, yes. And at that hearing, the court chose to believe this convicted... or this disbarred attorney who had had prior problems with his veracity and who had previously disregarded rules from his DOJ handlers and admitted that he had taken $128,000 more out of Central America even after he began cooperating. But didn't the record before the magistrate judge indicate that your client asked Mr. Serral's advice about whether he should hire a lawyer? I mean, that's not anything you do if you think you are dealing with a lawyer. It doesn't make a lot of sense. At the time that relationship had gone on that long, and that was three or four years into the relationship, where he had advised him on all aspects of tax and IRAs and overseas transfers of funds and setting up Panama corporations, all of that. But he'd never advised him on anything involving criminal law, and now all of a sudden he's being faced with a criminal law inquiry. And so the idea that he wanted to get a lawyer that had expertise and asked him about a lawyer, we think that's been overblown by the prosecution to indicate that, oh, you didn't know he was a lawyer because you asked for a lawyer. Well, he was looking for a different kind of lawyer. So when you said something just a moment ago about a motion to dismiss, my understanding was the issue that was raised before the district court, that in your appellate briefs your client claims was wrongly decided by the district court, was the denial of your, on Dr. Benner's behalf, motion to suppress and exclude the testimony of Saranello. Is that correct? I misspoke. It had nothing to do with the motion to dismiss. Absolutely, that is correct, although we did see that motion to suppress as dispositive or had hoped it to be because the entire case is built around the testimony of Mr. Saranello and almost nothing that if we suppressed his testimony and the fruit of the poisonous tree, there would not have been a case left to proceed on. But I did misspeak when I called it a motion to dismiss. You begin your arguments by saying that this case presents for us some egregious unfairness. Are you making a due process argument? Oh, absolutely. The combination of the things that happened here, I think, end up depriving him of due process. The biggest problem in this case, and there are a number I'd hope to touch on all of them, but the biggest one is that the key witness, it became absolutely clear, had also tried to get $673,000 more dollars out of Panama after he'd been caught getting the $128,000 out while working for the Department of Justice, and the report regarding that had some names and phone numbers in it that my office called, or my office had our Panamanian co-counsels call and determined that, in fact, by virtue of a single phone call of investigation that, in fact, Saranello had hired that Panama law firm to what they called liberate the $673,000 from the bank. So is it your theory that because Saranello was a shady guy, he was a man of disrepute, that we should reverse and enter a judgment of acquittal? Where are you going with that? That would be appropriate because of the Giglio violation here, we believe, actual acquittal. The information regarding the lack of veracity and believability of Saranello. The Gideon violation? Pardon me? What violation did you say? The Giglio violation. Giglio. Yeah, the Giglio, the failure to disclose this information that they knew or should have known, and they clearly should have known that the star witness of theirs, Saranello, had been involved in trying to get that $673,000. Now, in our view, they didn't go get that information, not because it was hard to get, because it was simple to get, and we filed a motion to exclude him also after our motion to suppress and provided more information that would put them onto this trail, but they just refused to go down it because they didn't want to find out their star witness was that dirty. But he was that dirty, and we never had a chance for the judge at the motion to suppress hearing to learn the full extent of that dirt, and we never had a chance for the jury to learn the full extent of that dirt. And as a result, both the district court judge and the jury ended up believing Saranello over Dr. Bradner, a military veteran, long distinguished career of being a surgeon, exemplary citizen, raised a family of five or six kids. He's driving down to Panama with the money and the gold in his car. Well, but let's talk about that, too, Your Honor, because the other big part of this case is... To keep it away from the Alaska court and from his wife. Well, everybody knows, I mean, the wife herself testified at sentencing. The children also testified at sentencing. Dr. Bradner took the position at the motion to suppress. His wife has emotional and mental problems. They were going through a third divorce. The first two had reconciled. Now it's the third one. This time it involved some boyfriends that hadn't been involved before. The children and Dr. Bradner all believe she has mental illness. He took that money to Central America to protect the family fortune so that it wouldn't be dissipated and used. From the depredations of the Alaska state court? No, because he never, Your Honor, he took it down there. How would she have gotten the money? Let's say he had not taken it to Panama. How would the wife have gotten the money? The court would have ordered it split through the divorce like they did. From the depredations of the Alaska courts. It's not like she was about to steal the money and destroy it. She would have gotten it fair and square in proceedings before the Alaska courts where he could argue about the mental illness, about the boyfriends. He could, you know, call her names, you know, the normal thing that happens in divorce proceedings. He was entitled to do that. But if that failed, she would have then had a, it would have been her money. So when you talk about what an abstaining citizen your client is, it sounds to me like he's driving her money. He's driving money to which he is legally entitled out of the country. At the time he took the money, yes. I don't know if that's your definition of an abstaining citizen. I don't know what you consider to be a crook. Well, let's look at what he did with the money when he went down there, Your Honor, because for starters he didn't break any law taking it down there, okay? He took checks and he took some gold, and it was not a violation of any law to take it down there. I'm sorry. If it was her money and he took it out of the country, what do you mean he wasn't breaking any law? I mean, would you, if, you know, if your partner, if your law partner took some of the money out of the business, I don't even know if you're her law partner, but I'm, you know. I understand. and he decided to take, empty the partnership bank account and drive it to Panama. Would you just say, well, he's not breaking any laws? I think you'd probably be calling the FBI, and you're saying my partner stole money from me. He's a crook. You'd be calling him names. Not when he goes to Panama and puts the money in the bank in his own name, and that's what he did to start with here. Before he met Sarinello. That's what crooks do. They put money in bank accounts with their own names. I am not sure. And then moved the money into an account where you couldn't tell he was the owner. Yeah, but he'd already created the paper trail of the money being down there, and so it shows his innocent intent to start with. It was Sarinello that had this idea. You know, you are spending a lot of time trying to persuade us that your client is an upstanding citizen, but it's perfectly obvious to the three of us that he's a crook. Now, you can keep arguing this point, but I doubt you're going to make any headway on that. Let's move on to this. So let's just accept the fact that he's a crook. I don't accept that. Okay, well, at least don't try to paint him as a hero, an upstanding citizen, and an honest guy. He's not an honest guy. One quick question before you move on, yes or no, is Alaska a community property state? Yes. Okay, thank you. In which case, of course, half the money is hers, right? But they both had the right to control it at the time he went down there. But jumping ahead, the interesting thing here is, or the important thing here is, what did he say when the Alaska court came knocking? Okay, when the Alaska court came knocking, did he say, what money, or I only got a couple hundred thousand? He said it's locked up in an illiquid investment that we can't get to for several years. Correct. And now there's a possibility that we – Because that was not true, right? Well, that's never been determined whether it's true or not, but apparently the jury found him guilty anyway. We believe that because there is evidence to show that Cerenello was setting up Dr. Bradner to steal his money, he was working very hard to keep it under his control and to keep it in Central America, and only the fact that he became an operative for the government and it became more important for him to move it back to America did that money ever come back. When Dr. Bradner needed access to that money to pay for scoliosis surgery for his daughter, couldn't get it. Cerenello convinced him it was not available, leveraged in some fashion. So whether he knew or did not know that that money was locked up, and we believe there's evidence to show he thought it was locked up, but even if he knew it wasn't locked up, he never lied about the money. And to be wire fraud, there must be fraud. There must be loss to a victim, and there was no loss here. The money came back. It was grabbed by ICE. The money came back with the interest it was earned. There was no loss. It leads to this calculation of the intended loss and the guidelines argument that I'll move ahead to now that required the clear and convincing evidence to show that he had intended this huge loss. Have you advised your client that if we agree with you on sentencing, that on remand Judge Gleeson could increase his sentence? Yeah, he's aware of that. Okay. We certainly believe that based on the miscalculation of this intended loss to where the idea that he was going to steal all this money from Mrs. Bradner, it's just not supported by the evidence. It needed to be clear and convincing evidence, and it wasn't even more likely than not presented. The evidence really consists of nothing more than the government informant, Mr. Serinello, trying to lead him on phone calls to say something like, yeah, let's write this letter that says the money's all lost. He never agreed to that. There was never such a letter written. Serinello tried as he might to get something like that in the record, and it never happened because Dr. Bradner never intended to permanently deprive his wife of her money. Are you arguing you might ‑‑ your standard before us is that considering the evidence and the like most favorable to the government, a rational jury could not have reached the conclusion that he did with respect to, for example, the fraud charges? Well, had they been instructed properly, I don't think they could have because if they had understood more clearly the need for there to be an actual loss to the victim to consist of wire fraud, and we asked for delineating jury instructions on that, but they weren't given. Based on the way they were instructed, I don't think they felt like they had any choice. You have one and two or five minutes. Boy, there's so much more I wanted to tell you, Your Honors, about this case. We've read your briefs very carefully. We've studied the records, sir. And so I will reserve and review my notes for a few more minutes, and thank you. May it please the Court, Alyssa Hart Mahan for the United States. The record in this case demonstrates that the defendant intended to defraud his wife by taking millions of dollars in marital assets, driving millions of dollars in marital assets to Central America, hiding them when he was unsuccessful in hiding those assets in Costa Rica, finding a way to hide them in the name of a shell corporation in Panama, misrepresenting the availability of those funds, and the record clearly demonstrated that he falsely represented to the divorce court that he did not have access to those funds. What's the intended loss? The district court properly found that the intended loss was $4 million. How could that be? Half the money was hers. I mean, was his, community properties. So the district court's calculations began with the divorce court order that was entered in 2011, dividing the marital assets between the two parties. The divorce court awarded the wife, awarded Mrs. Brandner the $1.2 million IRA in its entirety, awarded her 60% of the remaining Panamanian funds, which was 60% of the $3.2 million that the defendant had taken in cashier's checks to Panama. The district court also included in its entirety the assets that the defendant hid in Costa Rica because those assets were never disclosed to the divorce court. The defendant completely hid the fact that he had. So when he drove to Central America, he had $3.2 million in cashier's checks. He had at least 500 ounces of gold in the car, and he also had approximately $350,000 in cash. The cash and the gold he deposited in Costa Rica. The gold was in a Costa Rican safe deposit box. The cash was invested in CDs in a Costa Rican bank account. The defendant never disclosed the existence of the gold or the funds in Costa Rica to the divorce court. So the district court included those amounts in their entirety because they were not covered by the divorce court's decree. And the court used the value of gold in 2007. So what's the rationale of that? Why isn't half of that money his? Because the court found that he intended to retain that money in its entirety. The divorce court wasn't aware of it, and that that was the defendant intended to keep that money. Well, he's entitled to keep his own money, right?  I mean, the divorce court awarded him, I think, 40 percent of the marital assets. And the marital assets then were what, $8 million, $9 million? I think I would need to check the record. I believe it was in the neighborhood of $5 million or $6 million. Then I don't understand how you get close to $4 million. So the district courts, I've explained the district court's methodology for calculating the loss. That sounds wrong to me. Because it included 100 percent of the Costa Rican assets. Is that the issue? Well, I mean, I think it's really simple. I mean, you take the global amount of assets, which seems to be around in the $4 million to $5 million range, and you divide it in half. I mean, half is his. So if he wanted to take his own money to Panama and roll it through some shell corporations, he was entitled to do that, right? I mean, not if he wasn't reporting the foreign accounts, Your Honor. Well, he was entitled to do it. He also had an obligation to report. Yes, that's correct. But that doesn't mean he's not entitled to do it. That's right. He simply violated or might have violated a reporting requirement. So the answer to Judge Parker's question is, yes, he was entitled to do that. With the funds that belonged to him, again, these were marital assets and there was a court order in effect. I think the question was, the predicate for the question was pretty clear. I mean, half the money was his. I mean, he may have had reporting requirements and whatnot, but he could have taken his half of the money and deposited them in Panama or Costa Rica or, you know, rolled them up into rolls and smoked them, you know, or given them away to the poor, right? I would dispute the 50 percent figure. The divorce court awarded her 60 percent. All right. So some figure 40 percent, 50 percent. There's no question that the divorce court awarded him a portion of the marital assets. Okay. In this case, it was 40 percent. So how does the district court, giving 100 percent of the Panama, how is that squared? I mean, some significant portion of that money was his. The district court found that the intended loss encompassed the full amount of the Costa Rican assets. Well, I understand that's what the district court did. Your job is to justify it. Your job is to explain to us why the district court wasn't wrong. Well, I would point out that the district court used 500 ounces of gold as the amount of gold that was in Costa Rica. There was some evidence suggesting there was at least 1,000 ounces of gold in Costa Rica. So I would submit that the district court used a conservative figure in valuing the gold that was in Costa Rica. Well, it doesn't really matter. That's not a justification. The district court found what it found to be the amount. If the district court thinks the amount was greater, it could have found a greater amount. But in the end, the fact that there's evidence pointing to more money doesn't change the fact that the district court made a finding as to how much money there was. And that then becomes a fact. That becomes you can't shimmy that fact around. So then you have to explain how 100% of that belongs to the wife when it's community property, and, you know, half or 40%, you know, whatever, some amount of it belongs to the husband that he can do with as he pleases. The district court's reasoning was that the defendant intended to defraud the wife of the full amount. We know what the district court said. That's not what we're asking. We're asking you why you believe that was correct. Because of the defendant's failure to disclose that amount to the divorce court. The divorce court could not have taken away either 40% or 50% of those amounts, correct? I'm sorry. The Alaska Divorce Court could have included, if he had disclosed those assets, the court could have included that. The most the wife would have been entitled to was 60% of whatever that amount is. Under the court's existing order, it was 60%. But, again, the court wasn't aware of those. How much money in the aggregate are we dealing with? For the entire divorce court case or just for this? Yeah, if Dr. Bradner had been 1,000% honest and reported every asset to the Alaska Divorce Court, what's the total amount? It would exceed $5 million. Okay, let's say it's $5 million. And she said the divorce court in Alaska said 60% to the wife, 40% to the husband? She awarded the IRA in its entirety to the wife and then, I believe, did 60%. That takes it down to about 4 million? I think that's correct. About 3-7, right? You said the IRA was 1.3. 1.2, I think. 1.2, okay. Yeah, so if you take away the IRA, and, again, this isn't – I don't want to speak out of turn because I think the divorce – the marital assets included other assets such as the family home in Anchorage. But just speaking about the funds that were at issue in this criminal case, you have the $1.2 million IRA, and then you have 60% of the remaining assets. And that was how much? So if you take out the IRA, that was 3.2 million in Panama, and then another close to 1 million in Costa Rica, I think just under 1 million with the gold and under the court's calculations. Did the money in Costa Rica and the value of the gold ever come back? So the money in Costa Rica, the defendant claimed as a theft loss. He asserted that the lawyer who helped him set up the Costa Rican bank accounts absconded with that money. I think $50,000 of it was transferred to the Panamanian bank account, but the remaining $320,000, he alleges, was stolen by his Costa Rican attorney. And nobody knows what's happened to the gold. Okay. The record, we believe, shows that the district court – so under the district court's calculations, the court used the clear and convincing standard to find a loss, intended loss of $4 million, and determined that – I'm sorry. I didn't hear what you said. I'm sorry. Sorry. So the court's loss calculation, the court used the clear and convincing standard in calculating loss, found a loss amount of $4 million. And after applying an obstruction of justice enhancement and a sophisticated means enhancement, arrived at a sentencing range of 87 to 108 months. And the court determined that a downward variance was appropriate because of the defendant's age and health and collateral consequences that he would suffer. So the ultimate sentence imposed was 48 months' imprisonment, which was significantly below the guideline. That's correct. The district court at sentencing also found that the tax loss was $550,000. However, because of the way the offenses were grouped, that didn't end up affecting the ultimate guidelines range. The range was based on the fraud loss amounts. Turning to the arguments that the defendant raises regarding attorney-client privilege, the district court – the record reveals the district court very carefully considered all of the evidence here, determined that there was no attorney-client, the defendant did not establish the existence of an attorney-client relationship, and that even if such a relationship existed, the crime-fraud exception would apply. I would submit that all of the trial evidence regarding defendant's concealment of those funds supports the district court's crime-fraud ruling. As the district court recognized, Serinello had a number of credibility problems. Disbarred attorney, pled guilty to conspiracy to commit wire fraud, lied to government agents about his access to funds. All of that was in the record. The jury was fully aware of all of these credibility problems. However, the documentary evidence corroborated Serinello's testimony about the defendant. The documents showed that the defendant was the only signatory on the Panamanian bank account and that the defendant was directing that bank to move those funds around and that the defendant alone could do that. It wasn't Serinello that instructed the bank in 2008 to transfer $600,000. What about this question about the claim that Serinello was involved in some other bad stuff? Some other bad stuff that the government knows about and didn't disclose on the giglier? So the $673,000 amounts that were in Panamanian bank accounts, that was related to the other case, the stock-fraud case that Serinello essentially pled guilty to. And the government turned over all of the evidence in its possession to the defendant about those accounts. And basically what happened was at the time Serinello was charged in the stock-fraud case, and when he pled guilty and agreed to cooperate with the government, he provided a list of bank accounts. The government used mutual lateral assistance treaty requests to freeze those Panamanian bank accounts and was able to repatriate the proceeds of the stock-fraud using those MLAT requests. And this was all happening from 2010 to 2012. In 2013, the government learned that there were some accounts that hadn't been frozen, that weren't covered by the MLAT request. Those are the accounts containing the $673,000. The government contacted Serinello, who said he wasn't aware, that he had assumed those accounts were frozen. Serinello worked with the government to try to bring those funds back. There's an email in the record where Serinello is emailing the Panamanian bank requesting that they wire him the funds, and that was all as part of his cooperation with the government. But that was unsuccessful. And so in 2014, law enforcement agents and AUSA and Serinello traveled to Panama to try to withdraw those funds from the Panamanian bank. And the report of that trip was turned over to the defendant. And essentially, the government didn't find any evidence that it was Serinello that was attempting to withdraw those funds. Rather, the information they got from the bank was that it was a high-ranking Panamanian official who was trying to withdraw those funds. Remind me, does the record reflect what Serinello is doing now? The record does not reflect. I think he was scheduled to be sentenced at some point after the defendant's trial. Well, does the public record reflect what happened to him, what he's doing? I was curious and looked it up, and I believe he was sentenced to time served. How long was that? I'm not sure how long he was in custody. That was a case out of the Central District of California. I can provide that to the court if you'd like to see it. In any event, the government did not have any indication that Serinello was the individual trying to withdraw those funds. The government turned over everything in its possession and even produced a couple of additional memoranda of interview with the Homeland Security agent that went on the trip and the two IRS attachés based in Panama who attended that meeting. All of that was provided to the defense. The government didn't fail to disclose anything in its possession. And the e-mails that the defendant provided suggesting that Serinello was involved in withdrawing those funds simply are not sufficient to establish that he was lying about the $673,000. Attempting to withdraw the funds, right? Right. The funds were never released to him. I thought the theory was that he worked with this Panamanian official. That may have been the theory. I'm not sure. I think the allegation was that he was working with Panamanian lawyers to try to withdraw those funds. But the bank refused to release them to Serinello when he went with government officials. And they left a statement from Serinello instructing the bank not to release the funds to anybody else and stating that those funds were part of an ongoing criminal investigation in the United States. In any event, the testimony, Serinello's testimony about the $673,000 was not material. He had a long history of falsehoods that the jury was well aware of. And one additional piece of impeachment evidence would not have altered the verdict here, especially when his testimony about the defendant was fully corroborated by the documentary evidence that he was moving these funds around, he had control of these funds. And his statements in the recorded conversations with Serinello make clear that he had no intention of returning the funds to his wife. He had no intention of complying with the Alaska Divorce Courts order. You know, he would talk to Serinello, hey, could we move these funds to Uruguay? How about Belize? Would that be a better place than Panama? Those aren't the statements of somebody who's acting in good faith and who plans to return the funds to the court or to his wife. The district court properly denied the motion to suppress and properly denied the motion to eliminate regarding Serinello's testimony. Turning briefly to the continuance issue. Your opponent did not raise that in his argument. We rest on our briefs on that point. And if the court has no further questions, we ask for an affirmance of his convictions and sentence. Thank you. Thank you. Okay, thank you, Your Honors. Before you get into your rebuttal, I want to follow up on something Judge Kaczynski just asked you when you were up before. I mean, do you want this case to go back for resentencing? That's our third choice, Your Honor. We would like to think that this Giglio violation, purposeful as it was. Let's say we're not going to reverse it. Okay. We would seek a remand for a new trial with our second request. Just hypothetically, you don't get that. Okay. Then we do request that it be sent back for resentencing, yes, because we believe the guidelines were miscalculated and that the substantive reasonableness of the overall sentence was not appropriate. The sentence was half of the minimum under the advisory guidelines? Roughly it was cut in half under the guidelines, but the guidelines, of course, were horribly miscalculated with this intended loss that was not shown by clear and convincing evidence. We believe that the guideline for the wire fraud should have been a seven, not a 22 or whatever that number they came up with was. If the actual wire fraud loss is a seven, then the tax evasion case becomes actually the principal sentencing case, and I believe our brief argues in terms of a level that would call for something in the range of a 14-month sentence. The district judge in this case was Sharon Gleason in Alaska? Sharon Gleason, yes. You had said he earlier. Okay. Yes. I'm sorry if I would have done that. Yes. The idea that Mr. – last time we looked, Serinello was still awaiting sentencing because apparently he was still continuing to work for the government. The idea that he ended up with time served in a case where we know he turned over as government evidence within a matter of days of being arrested means he actually served maybe only a few days for a lengthy criminal career as a penny stock money launderer and Panamanian Corporation fraudster. And it's just so unfortunate that Dr. Bradner ran into this person because he was there looking for legitimate advice, but when you end up in the hands of a penny stock fraudster who's been hiding money for people wanting to hide it. I'm sorry. Legitimate advice on how to take money out of the country to keep them away from the court? Yeah. He testified at this motion to suppress. The first thing he did, he asked him whether he'd broken any laws yet, and it made it clear that he didn't want to break any laws because he's a doctor. He doesn't want to take the risk. Sounds a little bit like Walter White winding up with Saul Goodman. I'm not sure if I – You probably haven't seen Breaking Bad, have you? No, I don't watch many movies. Okay. Or that's a TV show. I guess no, I haven't. Okay. All right. Thank you. But the idea that the crime-fraud exception should apply here, the crime-fraud, to the extent that he ended up doing any crime or fraud, it was because Serinello led him that path. He did not seek out Serinello to do anything criminal or illegal. Well, he wanted to keep the money in Alaska, and Serinello just said, no, no, no, take it to Panama, right? No, no, no. He just said, I want to turn the money over to the superior court in Anchorage so they can give it to my wife. And Serinello said, don't do that. Take it to Panama. Give it on vacation. It was already down there, Your Honor, before he met Serinello. But Serinello was – I think you're out of time. The doctor was not – You're into negative numbers now. You're going to start owing us some money. Some time, rather. Time is money. So I think we're done. All right. So I appreciate you listening to me today. Thank you. Thank you. Thank you both. Okay. Cases are, you will stand submitted.
judges: Parker, Kozinski, Hawkins